# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00536-CR

---

**Stevie Dwayne Williams, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 428TH DISTRICT COURT OF HAYS COUNTY**
**NO. CR-18-1091-D, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Stevie Dwayne Williams was convicted of capital murder of a child under ten-years-old. Tex. Penal Code § 19.03(a)(8). He was sentenced to life imprisonment without parole. *See id.* § 12.31(a)(2). In three appellate issues he alleges that: (1) the evidence was insufficient to prove either that he was the one to inflict the injuries that caused his twenty-month-old son's death or that he worked with his wife to kill their son; (2) the trial court abused its discretion when it admitted evidence of a previous child abuse investigation involving his son; and (3) the trial court abused its discretion when it admitted evidence obtained from Williams's and his wife's cellphones in violation of *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). We affirm the trial court's judgment of conviction.

# BACKGROUND

**The Incident**

On July 4, 2018, Williams's wife, Dazrine Williams, called 911 and told the operator that their son, Mason, had not woken up from his nap. A recording of the call, which lasted seven minutes, was played for the jury. During the call Dazrine stated that Mason was unconscious and not breathing. She explained, unprompted by the operator, that Mason sometimes woke up with unexplained bruising in his ear, that a family member suggested it may be low iron, and that he had unexplained bruises on his body that were not present prior to his nap. The operator gave Dazrine instructions for administering CPR. Dazrine told the operator that Mason's mouth would not open. Dazrine asked Williams to help her and told the operator that she was putting the call on speaker. The operator continued to instruct the parents on how to administer CPR until instructing them that one of them needed to go meet first responders and that the other needed to continue CPR. The operator discontinued the call once the first responders arrived and could be heard over the phone. At trial, the 911 operator testified that in her experience there are certain sounds she usually hears over the phone when someone is administering CPR. She testified that during the call with Dazrine she did not hear any counting or other noise that would indicate CPR was actually taking place.

Firefighter David Shultz testified regarding the scene when first responders arrived and the resuscitation efforts attempted by himself and other first responders. When first responders arrived on the scene, they found Williams in the bathroom with Mason. Williams appeared to be attempting CPR, however, Shultz explained that it would have been "very ineffective" because he was holding the child in his arms. Williams quickly handed Mason to Shultz. Mason had no pulse, was unconscious, and was not breathing. Shultz began CPR using

2

one hand and at no point wrapped his hands around Mason or used his thumbs. Schultz noticed bruising on Mason's sides that "wrapped around a little bit" and a bruise in the center of his forehead.

Fire fighters and EMS administered CPR and other lifesaving efforts for fifteen to twenty minutes without getting any vital signs. Once he stopped CPR, Schultz noticed that the child's arm was stiff, which told him that "the child ha[d] been gone for quite a while at that point." Williams told Schultz that he had gotten Mason up from a nap, realized he was not conscious or breathing, and then called 911. Schultz noticed that the child had on a clean diaper, which he thought was inconsistent with Williams's story. Shultz reported the bruising he saw on Mason to a police officer.

Another firefighter on the scene, Johnnie Smith, testified that based on his experience with family members' reactions while CPR is being administered, he thought something was off about Williams's reaction. He explained that Williams "seemed more worried about [them] fixing the situation. Like if somebody wrecked their car or something." Smith was unable to open Mason's mouth. Smith described Mason's skin and hair as a little wet but not dripping as if he had just gotten out of the shower a few minutes prior. Williams mentioned that "he had given the child a bath at some point." Williams was not visibly wet. Smith described the bruises on Mason's sides as dots, like from fingers. He testified that they could not have been caused by the CPR they performed.

A paramedic who was also present at the scene, Kyle Skinner, explained that the joint stiffness seen in Mason during the resuscitation attempts indicates that rigor mortis had set in, "which is the first sign of death," and that it can take anywhere from one hour to six hours

3

after death for rigor mortis to start. He described the bruising on Mason's sides as "fingertip type bruising."

Police officers arrived on the scene while EMS was attempting lifesaving measures. Officer Jerritt Bean testified regarding photos of the crime scene, which included photos of Mason after lifesaving attempts had stopped and showed bruising on his forehead, along his sides, and in the center of his back. A photo of the bathroom showed standing water in the bathtub. A muted video from the officer's bodycam footage taken at the scene was played for the jury.

Detective Pedro Carrasco testified that he was assigned to the case after lifesaving measures were discontinued. When he arrived at the scene, he noticed in the bathroom that there was standing water in the tub, a nebulizer on the sink, soiled diapers in a trash can, and a wet t-shirt. In the parents' bedroom, he noticed wet shorts.

Multiple first responders from the scene testified that Williams was visibly upset, crying, hyperventilating, and seemed confused and that he was distressed when the paramedics stopped lifesaving measures. These witnesses also described Dazrine as "apathetic" and calm.

**The Injuries**

Dr. Suzanne Dana, a forensic pathologist, testified regarding Mason's injuries based on the autopsy she performed on July 6, 2018. Autopsy photos were admitted into evidence. Dr. Dana testified that in her opinion the manner of death was homicide and the cause of death was "hypoxic encephalopathy, which means swelling of the brain due to lack of oxygen, and it was caused by chest compression in an infant with prior blunt force traumatic injuries."

4

Based on the bruising to his chest, back, and sides, Dr. Dana believed that Mason's chest was compressed to the point where he could not expand his lungs to get enough oxygen.

Mason had multiple injuries over his body that were of various ages. The injuries that occurred within the 24 hours preceding his death included: bruises to his face, lips, chest, back, jaw, and his sides; and internal bleeding of the diaphragm and under the sternum. The bruise to his forehead was caused within the 24 to 48 hours prior to his death. Mason's older injuries included: a healing skull fracture on the left occipital bone, some of the bruising on his back, bruising on his right hand, bruising on the right side of his chest, a healing rib fracture, "some old healed rib fractures," a burn scar on his foot, and scars on his buttocks. She also testified that rigor mortis, or stiffening of the joints after death, starts becoming evident in the muscles about two hours after death and then dissipates after about twenty-four to thirty hours after death, meaning the joints are not stiff anymore.

Dr. Marion Forbes, who had previously treated Mason, testified that the process of chest compressions causing a deadly lack of oxygen to the brain is called asphyxia. She compared the force necessary to cause asphyxia to that of a very heavy object—like a car or bookcase—falling on the chest. Without oxygen to the brain, the person would lose consciousness and die within about five minutes. She opined that a reasonable person would notice that something significant and life-threatening was happening.

Dr. Forbes testified that she evaluated Mason's nine-month-old sister, D.W, after Mason's death pursuant to CPS protocols. The parents would not speak with her. She found similar bruising to the baby's chest, back, and one of her ears and similar rib injuries as those found on Mason. She testified that bruising in the ears raises concerns of child abuse because it is an area that is difficult to bruise accidentally.

Benjamin Holladay, a foster parent who adopted D.W. after she was placed in his care following Mason's death, testified that D.W. had no issues with unexplained bruising and no additional rib fractures since she had started living with him. He testified that there had been a concern raised regarding a blood disorder that may make her more prone to bruising, but he had not noticed that she bruised more easily than his other two children.

Dr. Forbes testified that a year and a half before Mason's death, in January 2017, the parents had brought Mason in for severe burns to his feet and groin area. Because she did not believe the parents' story matched the injuries, Dr. Forbes ran additional tests including x-rays. The x-rays revealed rib fractures that raised a concern that physical child abuse had occurred. Dr. Forbes testified that Mason's rib fractures were the same type that were discovered during the autopsy. Mason's medical records and copies of the x-rays were entered into evidence. Dr. Forbes told the parents during a phone conference that the rib fractures would have required potentially life-threatening levels of compressive force to create. Dr. Forbes reported her findings to CPS and law enforcement.

Antonio Zamora, a former CPS caseworker who had worked on Mason's 2017 case, testified regarding the CPS investigation. The investigation was initiated based on concerns regarding Mason's burns and the subsequently discovered skeletal fractures. Mason was removed from his parents' care and placed in the custody of Dazrine's sister Amanda Del Cueto until December 2017. CPS returned Mason to his parents at that time and then monitored the situation through March 2018—about three months prior to Mason's death. Zamora testified that the 2017 CPS investigation determined that the burns were accidental and the fractures were categorized as "unable to determine," meaning "either there wasn't enough

information to determine that abuse and neglect did occur or there [was] enough information but not enough information to assess who's responsible."

**The Police Investigation**

On July 9, 2018, Detective Carrasco went to Williams's grandmother's house to talk to Williams. The recording of that interview from Carrasco's body camera was admitted into evidence and played for the jury.

During the interview Williams told officers his account of events. He stated that he checked in on Mason an hour before the incident and he was fine. He told officers that he was the one that found Mason, that he would not wake up, and that his mouth would not open. He said that he ran water over Mason in the bathtub. He also told them that he was pumping Mason's chest and then a bunch of people ran into the room.

During the interview, Williams was asked why his father-in-law told detectives that he thought something may have happened to Mason while in Williams and Dazrine's care. Williams responded that he did not know, that he and Dazrine were not on speaking terms with him at that point, and that his father-in-law was the person who was at the home and saw them with their children the most. Williams told the officers that he and his wife knew "for certain what happened" and that "something other worldly" hurt both his children. When Detective Carrasco told Williams that they could not charge a spirit and pointed out that the only people at home at the time of his son's death were Williams and his wife, Williams told the detective that his father-in-law "is the only person you guys need to talk to, like I said I have no animosity towards [him] but the things that he said in the last few days—I think someone should talk to [him]." Williams also told officers that there was "no way anybody near us can hurt our

babies" and that neither he nor his wife would ever hurt their children. Williams asked the officers to "figure out what happened."

Detective Carrasco testified that after his interview with Williams, he interviewed Williams's father-in-law and ruled him out as a suspect. Detective Carrasco testified that throughout his investigation, no witness had seen any injuries on Mason the week prior, including the day prior to Mason's death.

Detective Carrasco testified that both Williams and Dazrine were arrested for the murder of their son on July 23, 2018. Detective Carrasco described their demeanor at the time as being "in shock."

Sergeant Daniel Gooding testified that he assisted with the arrest of Williams and Dazrine. Once they reached the jail, Sergeant Gooding asked Williams for the passcode for their cell phones. He testified that Williams voluntarily gave him the passcode. He testified that he did not remember giving Williams *Miranda* warnings and was not aware of anyone else giving the warnings.

**The Evidence at Trial**

Williams did not testify at trial. However, on July 30, 2018, he had testified in a CPS pretrial proceeding. Excerpts of the transcript were read during the trial by Detective Carrasco and the prosecutor. Williams denied that he or his wife murdered his son or ever hit either of their children. He stated that neither he nor Dazrine had ever spanked Mason. Williams said that Mason had woken up a few other times with unexplained bruising in his ear. He testified that nothing unusual happened and that he and Dazrine were playing and laughing with Mason before naptime. He testified that he and Dazrine were together with Mason prior to

8

putting him down for a nap and checked on him multiple times together throughout the nap. He testified that he was the one that tried to wake up Mason from the nap and that when he picked Mason up he was stiff. He took Mason to the bathroom and ran cold water over him to try to wake him up. He also tried using Mason's nebulizer and attempted chest compressions.

When asked why he took time to change into dry clothes while attempting to revive Mason, Williams said that he had gotten in the bath in a shirt and underwear, that he was naked when he got out of the bath, that he could not remember why he was naked, and that Dazrine brought him dry clothes and told him EMS was on the way. He also testified that he was performing CPR on Mason while Dazrine was on the 911 call. He testified that he did not delay calling 911 and that the 911 call was "pretty immediate" after getting his son into the bathtub. He testified that he changed Mason's diaper while Dazrine was on the 911 call.

The State presented evidence that was retrieved from Williams's and Dazrine's phones and Facebook accounts through Detective Joseph Swonke. In videos created by Williams and Dazrine and posted to Facebook soon after the CPS case regarding the 2017 injuries was resolved, the couple accused the hospital of injuring Mason by accident and blaming them as part of a coverup. Photographs from the phones from March 9, 2018, through June 27, 2018, showed various visible injuries on Mason. In a video from June 2, 2018, Williams is heard from behind the camera and hits both children in the forehead with the phone that is recording the video. Detective Swonke testified at trial that he recognized Williams's voice on the video from speaking to Williams previously. In a text message, entered into evidence, Dazrine texted Williams that Mason had "been telling [her] no all day," and Williams replied that she should "whoop his little cheeks."

9

Through an employee of the Hays County Sheriff's Office's mail room, the State presented jail mail that Williams sent to his grandmother. The letter included a copy of a news article about people dying in their sleep after having a seizure and included a handwritten note that read, "The circled part is my only worry, but just because it's more common in older people doesn't mean it's not possible for babies, right?"

Multiple family members testified about events leading up to and following the day Mason died. Williams's mother testified at the trial that there was a family gathering the day prior to Mason's death and that she did not see any marks or bruises on either child, who were both wearing only a diaper. Williams's grandmother testified that Williams called her the day Mason died and told her that Mason was dead and that he had called 911. According to phone records entered into evidence, Williams called his grandmother twelve minutes prior to the 911 call.

Dazrine's sister, Lindsay Ortiz, testified that Williams and Dazrine lived with her father at the time of Mason's death. Ortiz and her grandmother stayed at her father's house the weekend prior to Mason's death. About four or five days before Mason's death, Ortiz, her father, and her grandmother all left on a family vacation, which left Dazrine and Williams home alone with their two children. Ortiz testified that she found out about Mason's death the same day it happened and that she returned to the family home the next day. She described Williams's behavior when she saw him as "unusual." Ortiz testified that the next day, July 6, 2018, Dazrine called her and asked her, "If anyone calls you, would you just say Mason was a rough boy?" Ortiz could hear Williams talking with Dazrine during the call but could not hear what he was saying. She testified that after she expressed concerns about the cause of Mason's death, both

Williams and Dazrine blocked her on Facebook. She was told, but did not specify by whom, that she could not attend the funeral because she had doubts about what happened to Mason.

Del Cueto, Dazrine's sister who had custody of Mason during the CPS case, testified at trial. Mason had no bruising and no injuries during the time he lived with her. While she had custody of Mason, the visitations with his parents were tense, and Williams told her that she would not be allowed to see Mason after the parents got him back. She testified that she never saw Mason again once he was returned to his parents because "there was always an excuse" given by Dazrine for why Del Cueto could not visit.

After hearing all the evidence, the jury found Williams guilty of capital murder. The State did not seek the death penalty. The trial court sentenced Williams to life imprisonment without parole.

## DISCUSSION

In three issues on appeal, Williams alleges that the evidence was legally insufficient to support his conviction and that the trial court erred by admitting the evidence of the 2017 CPS investigation and by failing to suppress the evidence retrieved from the cellphones.

### Sufficiency of the Evidence

"When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017)). "This standard requires the appellate court to defer 'to the responsibility of the trier of fact to fairly

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). Although factfinders "may not speculate about the meaning of facts or evidence," they are permitted to "draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). "We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution." *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012)). This is because factfinders are "the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony." *Id.* (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13).

"[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Hooper*, 214 S.W.3d at 15; *see also Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010) ("[I]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient."); *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003) ("If, given all of the evidence, a rational jury would necessarily entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal."). "Speculation is mere theorizing or

guessing about the possible meaning of facts and evidence presented." *Hooper*, 214 S.W.3d at 16.

A person commits capital murder if the person intentionally or knowingly causes the death of an individual under ten years of age. Tex. Penal Code § 19.02(b)(1), .03(a)(8). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id.* § 7.02(a)(2).

The State's theory of the case was that Mason was killed by his chest being compressed to the point that Mason could not get oxygen to his brain, which was caused by someone wrapping their hands around Mason's chest and sides and squeezing hard; that Mason was then placed in his crib and left there to die; and that Williams either caused the injury or aided Dazrine in causing the injury.

Williams alleges that the evidence was not sufficient to prove who murdered Mason. Williams concedes that the evidence is sufficient to prove that either he or Dazrine knowingly or intentionally killed their son but contends it is not sufficient to prove that he did so either alone or together with Dazrine. He argues that the jurors would have necessarily had a reasonable doubt regarding his guilt because finding that he was the one that killed Mason would require speculation.

We disagree. The evidence was sufficient to show that Williams either intentionally or knowingly killed Mason himself or was a party to the offense. *See Leza v. State*,

13

351 S.W.3d 344, 357 (Tex. Crim. App. 2011) (holding that jury is not required to unanimously agree whether defendant was principal actor or party). Williams testified at the prior CPS proceeding that he and Dazrine were together with Mason immediately before they put him down for a nap, that nothing unusual happened, and that he checked on him multiple times. However, Dr. Forbes testified that the force needed to cause Mason's injuries was significant, that death would have occurred within five minutes, and that a reasonable person would have noticed that something life-threatening had occurred. It would be a reasonable inference for the jury to make that Mason was killed during the time that Williams testified to being with Mason and that Williams was the one who injured him either alone or aiding Dazrine. *See Keith v. State*, No. 09-16-00166-CR, 2017 WL 6210865, at \*6–8 (Tex. App.—Beaumont Dec. 6, 2017, pet. ref'd) (mem. op., not designated for publication) (finding evidence sufficient to support capital murder conviction when defendant interacted with child victim around time of death even though he was not only person at home and there was possibility that someone could have interacted with child after he did).

When reviewing the sufficiency of the evidence, appellate courts look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13. Specifically, "[a]ttempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

Here, first responders noticed that Mason was in a clean diaper and had wet hair. Williams testified at the prior proceeding that he had run water over Mason to try to wake him up. There was a twelve-minute delay between when Williams called his grandmother and when

14

Dazrine placed the 911 call. And Dazrine's sister testified that Dazrine called her two days after Mason's death, with Williams heard in the background of the call, to ask her, "If anyone calls you, would you just say Mason was a rough boy?" It would be reasonable for the jury to infer that Williams had engaged in attempts to conceal incriminating evidence. *See id.*

Williams testified at the CPS proceeding that neither he nor Dazrine ever hit or spanked their child. However, Williams texted Dazrine, "whoop his little cheeks," and a video recorded on his phone contained his voice while the phone was used to hit each child on the forehead.[1] It would be reasonable for the jury to infer that Williams's statements were inconsistent. *See id.*

Williams pointed police to "otherworldly" entities and to his father-in-law. The jury reasonably could have believed that, based on the timeline established by the evidence, Mason's fatal injuries were caused about five minutes before he died, which according to the responding paramedic's and Dr. Dana's testimonies would have been one to thirty hours before first responders arrived. Williams's father-in-law had been out of town for four or five days prior to Mason's death. Williams also testified at the prior proceeding that Dazrine brought him a change of clothes and told him EMS was on the way and that he changed Mason's diaper while Dazrine was on the 911 call. It would be reasonable for the jury to infer that Williams's explanations were implausible. *See id.*

---

[1] Williams challenges the admissibility of the evidence obtained from his and Dazrine's cell phones in his third issue. As we address below, we find the evidence admissible. We address his sufficiency of the evidence issue first because "if meritorious, it would afford him greater relief than his other issue[s]." *Medina v. State*, 565 S.W.3d 868, 873 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *see also Demond v. State*, 452 S.W.3d 435, 445 (Tex. App.—Austin 2014, pet. ref'd) (noting that in sufficiency review, appellate courts consider "all evidence that the trier of fact was permitted to consider, regardless of whether it was rightly or wrongly admitted").

Further, Williams's actions before and after Mason's death include Williams telling Del Cueto that she would never see Mason again after he was returned to them, not inviting Ortiz to Mason's funeral after she expressed concerns about Mason's death to Dazrine, and blocking family members on Facebook who expressed concern or suspicion regarding Mason's death. These actions support a reasonable inference that Williams had "an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13.

Williams argues that *Walker v. State*, No. PD-1429-14, 2016 WL 6092523, at *1 (Tex. Crim. App. Oct. 19, 2016) (op., not designated for publication), supports his insufficiency claim. In *Walker*, the Court of Criminal Appeals found that the evidence was insufficient to show that either grandparent caused burns to a small child. The evidence showed that if the burns were intentional, they would have required the disabled grandparents to hold the child suspended in hot water for twenty seconds while holding her legs straight down. There was also another child in the home that had a violent history and could have been in the room with the injured child. *Walker* is distinguishable from the case before us. Here, the evidence that Mason's injuries were intentional and not accidental was overwhelming. Further, Williams and Dazrine were alone in the home with Mason, except for baby D.W, and there was no evidence presented that Williams was physically unable to cause the injuries to Mason. Furthermore, *Walker* has no precedential value because it is an unpublished opinion. *See* Tex. R. App. P. 77.3.

We overrule Williams's sufficiency of the evidence claim.

**Evidence of 2017 CPS Investigation**

In his second issue, Williams alleges that the trial court abused its discretion by allowing evidence of the 2017 CPS case to be presented; specifically, Williams challenges the

evidence of Mason's rib fractures in 2017 and evidence of his removal and later reunification with his parents.

We review a trial court's admission of evidence for an abuse of discretion. *Sandoval v. State*, 409 S.W.3d 259, 297 (Tex. App.—Austin 2013, no pet.). A trial court abuses its discretion only if its ruling lies outside the zone of reasonable disagreement. *Id.* Reversal under this standard requires more than solely disagreeing with the trial court's ruling. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Sandoval*, 409 S.W.3d at 297.

Williams argues that the jury could not have found that Williams caused the 2017 rib fractures beyond a reasonable doubt. *See Harrell v. State*, 884 S.W.2d 154, 160 (Tex. Crim. App. 1994) ("We therefore hold that in deciding whether to admit extraneous offense evidence in the guilt/innocence phase of trial, the trial court must, under rule 104(b), make an initial determination . . . that a jury could reasonably find beyond a reasonable doubt that the defendant committed the extraneous offense."); *see also* Tex. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.").

The State argues that the evidence was admitted under Texas Code of Criminal Procedure Article 38.36, which provides:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

17

Tex. Code Crim. Proc. art. 38.36. Specifically, the State argues that the relationship evidence was presented to show the timeline of when Mason lived with his parents and when his injuries occurred and to show that at the time of the offense Williams knew that if Mason was injured in the same way again it could result in death.

Based on the State's reasons for admitting the evidence, the dependent facts that the relevance of the evidence relies on is not whether Williams caused the 2017 fractures, but rather, whether child abuse occurred, whether the child was removed from and returned to his parents, whether he suffered injuries while away from his parents, and whether Williams had been informed that whatever had caused the 2017 rib fractures could cause death. The testimony of Dr. Forbes and the CPS caseworker were sufficient to prove all these facts.

Williams also argues that the evidence should have been excluded under Rule 403 because the probative value was low, it created a danger of unfair prejudice, it had a tendency to confuse or distract the jury, and it took up an inordinate amount of time. Tex. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."). A Rule 403 analysis generally balances four non-exclusive factors: "(1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019).

Williams argues that the CPS report that determined that the burns were accidental and that CPS could not determine the cause of the fractures renders the probative value of the evidence low and renders the State's need for the evidence low. However,

18

Williams's knowledge regarding the potentially fatal effect of the injuries goes to the material issue of intent as it shows a lack of mistake or accident. The timeline created by the evidence is relevant to establish the nature of the relationship between Williams and Mason at the time of the offense. Regarding the effect on the jury, the record does not indicate that the jury had a reasonable doubt that Williams murdered Mason but convicted him anyway based on the evidence of the 2017 CPS case. *See Garcia v. State*, 201 S.W.3d 695, 704 (Tex. Crim. App. 2006) (holding that probative value was not substantially outweighed by danger of unfair prejudice when court had no reason to believe that jury had reasonable doubt that Appellant murdered victim but convicted him anyway based on evidence of prior violence against victim). Further, "any potential prejudice was diminished by the trial court's limiting instruction."[2] *Id.* Williams argues that the presentation of the challenged evidence took up an inordinate amount of time because it took up almost as much time as the evidence presented regarding the charged offense. Assuming without deciding that Williams's calculation is correct, we do not view that as an "inordinate" amount of time in this case considering the importance of the evidence to show lack of mistake or accident, to establish the timeline, and to establish the nature of the relationship between Williams and Mason at the time of the offense. Considering the balance of the Rule 403 factors, we cannot conclude that the trial court abused its discretion by admitting the challenged evidence. *See Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006) (holding that trial court did not abuse its discretion when it could have reasonably concluded that probative value of challenged evidence was not substantially outweighed by Rule 403 factors).

---

[2] The trial court gave a limiting instruction to the jury that if they heard evidence of extraneous offenses committed by Williams, they could not consider it unless they found he had committed it beyond a reasonable doubt.

We overrule Williams's second issue.

**Evidence Collected From Cell Phones**

Williams argues that the evidence that was obtained from his and Dazrine's cellphones should have been suppressed because he was asked for, and gave, the passcode to the phones while he was in police custody and without being given *Miranda* warnings. *See* 384 U.S. at 467–68. The State does not argue that a *Miranda* violation did not occur. Instead, it argues that because there is no evidence in the record that Williams was coerced into giving the passcode, the evidence that was collected as a result of that information is admissible.

The trial court's ruling on a motion to suppress is reviewed under a bifurcated standard of review. *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). Almost total deference is given to the trial court's determination of historical facts. *Id.* The trial court's application of the law to the facts is reviewed de novo. *Id.* We view the record in the light most favorable to the trial court's ruling and will uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case. *Id.*

The Texas exclusionary rule requires that "evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America" be suppressed. Tex. Code Crim. Pro. art. 38.23. However, "mere violations of the *Miranda* rule are not covered by the state exclusionary rule contained in Article 38.23." *Baker v. State*, 956 S.W.2d 19, 24 (Tex. Crim. App. 1997). Specifically, the "fruit of the poisonous tree" doctrine does not apply to mere violations of the prophylactic requirements in *Miranda*. *Id.* at 22. The statement itself must be suppressed, but evidence subsequently obtained because of that statement does not require

20

suppression unless the statement was obtained through actual coercion. *State v. Pena*, 581 S.W.3d 467, 478 (Tex. App.—Austin 2019, pet. ref'd).

During the trial, Sergeant Gooding testified that Williams voluntarily gave him the passcode. No allegations of coercion were made during the suppression hearing, in the written suppression motion, or in Williams's appellate brief. Viewing the record in the light most favorable to the trial court's ruling, we conclude that there is no evidence of coercion. *See Ruiz*, 577 S.W.3d at 545. Thus, the trial court did not err by allowing the admission of the evidence obtained from the cellphones. *See Pena*, 581 S.W.3d at 478 (holding that evidence of drugs found in car after officer asked defendant if there were drugs in car without giving *Miranda* warnings was admissible because record did not reflect that statement was coerced).

We overrule Williams's third and final issue.

## CONCLUSION

Because we overruled all of Williams's issues, we affirm the trial court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: June 28, 2023

Do Not Publish

21